ACCEPTED
01-14-00593-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
1/26/2015 7:39:24 PM
CHRISTOPHER PRINE
CLERK

Case No: 01-14-00593-CR

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
1/26/2015 7:39:24 PM
CHRISTOPHER A. PRINE
Clerk

## IN THE TEXAS COURT OF APPEALS

### FIRST DISTRICT

### HOUSTON, TEXAS

---

TONY ESCOBAR
Appellant

VS.

THE STATE OF TEXAS
Appellee

Appealed from the 338TH District Court
Harris County, Texas

Trial Court Cause Number: 1344348

---

# APPELLANT'S BRIEF

---

WAYNE T. HILL
Texas Bar No: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Tel: (713) 623-8312  Fax: (713) 626-0182
wthlaw@aol.com

---

Oral argument is not requested

# IDENTITY OF PARTIES AND COUNSEL

**Presiding Judge at Trial**
Honorable A. Reagan Clark
Sitting by Assignment
338th Judicial District Court
1201 Franklin
Houston, Texas 77002

**Attorneys for the State of Texas**

**Trial attorneys for State**
Justin K. Wood
Julie Fletcher
Assistant District Attorneys
1201 Franklin
Houston, Texas 77002

**On Appeal:**
Alan Curry
Assistant District Attorney
1201 Franklin
Houston, Texas 77002

**Attorneys for Appellant**

**Trial Attorneys for Appellant**
Sam Adamo
Sam Adamo, Jr.
3200 Travis, 4th Floor
Houston, Texas 77006

**On appeal:**
Wayne T. Hill
4615 Southwest Freeway, Suite 600
Houston, Texas 77027

**The Appellant**
Tony Escobar

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL     i

TABLE OF CONTENTS     ii

ISSUES PRESENTED     iii

INDEX OF AUTHORITIES     iv

SUMMARY OF ARGUMENTS     v

STATEMENT OF THE CASE     vi

RECORD CITATIONS     vi

STATEMENT REGARDING ORAL ARGUMENT     vi

STATEMENT OF FACTS IN THE CASE     1

POINT OF ERROR #1     23

POINT OF ERROR #2     23

POINT OF ERROR #3     31

POINT OF ERROR #4     34

POINT OF ERROR #5     35

POINT OF ERROR #6     37

POINT OF ERROR #7     37

POINT OF ERROR #8     37

POINT OF ERROR #9     40

POINT OF ERROR #10     41

POINT OF ERROR #11     44

POINT OF ERROR #12     45

PRAYER FOR RELIEF     46

CERTIFICATE OF WORD COUNT COMPLIANCE     47

CERTIFICATE OF SERVICE     47

## ISSUES PRESENTED FOR REVIEW

**POINT OF ERROR NUMBER ONE**
THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN THE JURY'S VERDICT FINDING APPELLANT GUILTY OF CAPITAL MURDER BEYOND A REASONABLE DOUBT WHICH REQUIRES THE ENTRY OF A JUDGMENT OF ACQUITTAL (R-IV-VI)

**POINT OF ERROR NUMBER TWO**
THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR INSTRUCTED VERDICT OF NOT GUILTY AT THE CLOSE OF THE STATE'S CASE (R-VI-142,143)

**POINT OF ERROR NUMBER THREE**
THE TRIAL COURT ERRED WHEN IT ADMITTED THE 911 TAPE INTO EVIDENCE OVER APPELLANT'S OBJECTION (R-II-4,5) (R-IV-8,44)

**POINT OF ERROR NUMBER FOUR**
THE TRIAL COURT ERRED WHEN IT ADMITTED NUMEROUS AUTOPSY PHOTOGRAPHS INTO EVIDENCE OVER APPELLANT'S OBJECTIONS (R-VI-70-80; 82) (SX # 79,80,81,82,83,84,85,86,87,88,89,90,91,92,93)

**POINT OF ERROR NUMBER FIVE**
THE TRIAL COURT ERRED WHEN IT LIMITED APPELLANT'S CROSS EXAMINATION OF SERGEANT CLOPTON REGARDING INFLUENCES AND MOTIVES TO FABRICATE A STORY (R-V-12)

**POINT OF ERROR NUMBER SIX**
THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW APPELLANT TO ESTABLISH WHAT QUESTIONS SERGEANT CLOPTON ASKED AMBER THORNTON DURING HER INTERVIEW WITH HIM ON DECEMBER 28, 2011 (R-IV-278,279)(R-V-18)

**POINT OF ERROR NUMBER SEVEN**
THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW APPELLANT TO INTRODUCE AMBER THORNTON'S STATEMENT TO SERGEANT CLOPTON IN EVIDENCE PURSUANT TO RULE 801(E)(1)(E) OF THE TEXAS RULES OF EVIDENCE (R-IV-278,279)(R-V-12-17)

**POINT OF ERROR NUMBER EIGHT**
THE TRIAL COURT ERRED WHEN IT REFUSED TO ADMIT AMBER THORNTON'S STATEMENT TO SERGEANT CLOPTON UNDER THE RULE OF OPTIONAL COMPLETENESS. (R-V-135-144)

POINT OF ERROR NUMBER NINE
THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM CROSS EXAMINING AMBER THORNTON ABOUT HER HABIT AND ROUTINE OF LYING TO LAW ENFORCEMENT TO AVOID RESPONSIBILITY FOR HER ACTIONS. (R-V-159.160,193,194)

POINT OF ERROR NUMBER TEN
THE TRIAL COURT ERRED WHEN IT REFUSED APPELLANT'S REQUESTED JURY INSTRUCTION ON NECESSITY (R-VII-4) (SX # 59 & 60)

POINT OF ERROR NUMBER ELEVEN
THE TRIAL COURT ERRED WHEN IT REFUSED APPELLANT'S REQUEST FOR A JURY INSTRUCTION ON THE LESSER OFFENSE OF THEFT (R-VII-5,6)

POINT OF ERROR NUMBER TWELVE
THE TRIAL COURT ERRED WHEN IT COMMENTED ON THE WEIGHT OF THE EVIDENCE IN THE INSTRUCTIONS GIVEN TO THE JURY CONCERNING THE LAW OF CONSPIRACY (R-VI-4,5) (CR-I-240)

# INDEX OF AUTHORITIES

**CONSTITUTIONS**

| | |
|---|---|
| U.S. Constitution Fifth Amendment | 27 |
| U.S. Constitution Sixth Amendment | 37 |
| U.S. Constitution Fourteenth Amendment | 25 |

**STATUTES**

| | |
|---|---|
| Texas Penal Code 6.01, 7.01 and 7.02 | 27, 28, 29 |
| Texas Penal Code 9.22 | 42, 43 |
| Texas Penal Code 15.02 | 46 |
| Texas Penal Code 19.03(2) | 24 |
| Texas Penal Code 31.03 | 44 |
| Texas Code of Criminal Procedure - Article 36.15 | 42 |
| Texas Code of Criminal Procedure - Article 38.05 | 46 |
| Texas Code of Criminal Procedure - Article 38.14 | 30 |
| Texas Code of Criminal Procedure - Article 44.25 | 27 |
| Texas Rules of Evidence 107 | 38, 39 |
| Texas Rules of Evidence 401 | 32 |
| Texas Rules of Evidence 402 | 34 |
| Texas Rules of Evidence 403 | 32, 34 |
| Texas Rules of Evidence 404(b) | 41 |
| Texas Rules of Evidence 406 | 40 |
| Texas Rules of Evidence 701 | 36 |
| Texas Rules of Evidence 702 | 36 |
| Texas Rules of Evidence 801 | 38, 39 |
| Texas Rules of Appellate Procedure - 9.4 | 47 |
| Texas Rules of Appellate Procedure - 43.2© | 27 |

**CASE LAW**

| | |
|---|---|
| Bachus v. State | 46 |
| Bignall v. State | 44 |
| Booth v. State | 42 |
| Brooks v. State | 25 |
| Burks v. U.S. | 31 |
| Castillo v. State | 30 |
| Clewis v. State | 25 |
| Cornet v. State | 43 |
| Dowthitt v. State | 30 |
| Ex Parte Thompson | 29 |
| Flores v. State | 35 |
| Garza v. State | 27 |
| Gollihar v. State | 25 |
| Greene v. Massey | 31 |
| Guerrero v. State | 41 |

Hightower v. State  25
Hill v. State  29
Holiday v. State  44, 45
Homes v. South Carolina  40
Hudson v. State  27
Hughes v. State  29
In Re: Winship  25
Jackson v. Virginia  25, 26, 31
Jones v. State  46
Jordan v. State  37
Juarez v. State  43
King v. State  39
Laster v. State  26
McCullen v. State  25
Meadow v. State  39
Montgomery v. State  33
Morrison v. State  28
Mullaney v. Wilbur  25
Narvaiz v. State  26
Patrick v. State  28
Perry v. State  34
Rachel v. State  32
Ransom v. State  28
Rousseau v. State  44
Walters v. State  39, 40
Weatherred v. State  36
Reese v. State  35
Stobaugh v. State  31
Tillman v. State  37
US v. Maceo  37
Valdez v. State  28
Webb v. State  33
Winn v. State  30

# SUMMARY OF ARGUMENT

**POINT OF ERROR #1**
Where the evidence is insufficient as a matter of law to support a jury's verdict under any theory of law, the Appellate Court must reverse and enter a judgment of acquittal.

**POINT OF ERROR #2**
Where the State's evidence does not meet the legal standard to overcome an instructed verdict, the Appellate Court must reverse and enter a judgment of acquittal.

**POINT OF ERROR #3**
Where evidence from a 911 tape is irrelevant to any issue in the case and is highly prejudicial, it should be excluded as evidence at trial.

**POINT OF ERROR #4**
Where autopsy photographs are highly prejudicial and gruesome and there is no issue regarding the cause of death, the evidence should be excluded at trial.

**POINT OF ERROR #5**
Appellant is entitled to full and complete cross-examination concerning a witness' motive to fabricate testimony.

**POINT OF ERROR #6**
Appellant is entitled to present inconsistent statements to impeach the credibility of witnesses.

**POINT OF ERROR #7**
Appellant is entitled to present substantive evidence of a co-conspirator's statement pursuant to Rule 801 of the Rules of Evidence.

**POINT OF ERROR #8**
Appellant is entitled to present the full statement of a witness during cross-examination under the Rule of Optional Completeness.

**POINT OF ERROR #9**
Appellant is entitled to present evidence of habit and routine of a State's witness where it is critical to a credibility evaluation and determination.

**POINT OF ERROR #10**
Where evidence is raised that Appellant acted in accordance with Texas Penal Code, Section 9.22, he is entitled to a jury instruction on the defense of necessity.

**POINT OF ERROR #11**
Where evidence is raised that Appellant is only guilty of the offense of theft, he is entitled to a jury instruction on the lesser offense of theft.

**POINT OF ERROR #12**
The Trial Court is prohibitive from commenting on the weight of the evidence when instructing the jury on the law of the case.

## STATEMENT OF THE CASE

Appellant was indicted for the offense of capital murder. (CR-I-8) The indictment filed in this matter alleged that on or about December 20, 2011, in Harris County, Texas, Appellant did then and there unlawfully, while in the course of committing and attempting to commit the robbery of Russell Lopez, intentionally cause the death of Russell Lopez by striking Russell Lopez with a deadly weapon, namely a hammer. A second paragraph of the indictment alleged that on December 20, 2011, in Harris County, Texas, Appellant did then and there unlawfully, while in the course of committing and attempting to commit the robbery of Russell Lopez, intentionally cause the death of Russell Lopez by stabbing Russell Lopez with a deadly weapon, namely a sword. (CR-I-8) A jury found Appellant guilty of capital murder as charged in the indictment. (CR-I-258) Appellant's punishment was automatically fixed at life in the Institutional Division of the Texas Department of Criminal Justice . (CR-I-261) Appellant filed a Motion for New Trial on June 10, 2014. (CR-I-265) Appellant gave Notice of Appeal on July 3, 2014. (CR-I-271) The Trial Court's Certification of Defendant's Right of Appeal was signed on July 7, 2014. (CR-I-272)

## RECORD DESIGNATION

Record citations are designated:

Clerk's Record     (CR-vol-page)

Reporter's Record    (R-vol-page)

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is not requested

**STATEMENTS OF FACTS IN THE CASE**

Amanda Shonte Made worked with the Complainant's wife at My Fit Foods. On the evening of December 20, 2011, she and Marie Lopez (the Complainant's wife) closed the My Fit Foods store and went to the Complainant's home located on Plantain Drive. (R-IV-39) Upon arriving, Made noticed that the Complainant's black Tahoe was not in the driveway. When Made and Marie Lopez entered the home, they found the Complainant (Russell Lopez) lying on the floor in the entrance of the bedroom area. (R-IV-41) Made described the Complainant's face as being distorted to the point that she could not recognize him. His face was bloody and swollen. (R-IV-43)

Made acknowledged that she suspected that Complainant was involved in the drug business involving marihuana. (R-IV-49) The Complainant had confided in Made that he had previous troubles with the law involving marihuana. (R-IV-49) Made noted that the last time the Complainant was employed was approximately six months prior to this date. (R-IV-58) Made agreed that she would not condone drug dealing out of a home because it could endanger children. (R-IV-58)

Dawn Disneau with the Westlake Fire Department declared the Complainant dead on the scene. (R-IV-70) She observed that the Complainant had a sword laying across his left chest and left arm. (R-IV-72)

Artur Kuk with the Harris County Sheriff's Department responded to the Plantain address and observed another officer carrying two children out through a window. (R-IV-80) The entire house was ransacked. (R-IV-84) Kuk indicated that he learned the children had been tied up with clothing and the Complainant's Tahoe had been stolen. (R-IV-89)

Maurice Carpenter, a crime scene investigator with the Harris County Sheriff's

1

Department, noted there was no signs of forced entry at the Plantain address. (R-IV-102) Carpenter described the house as ransacked and noted that there were apparent blood stains throughout most of the areas of the house. (R-IV-103) He noted that there was a large concentration of blood near the pantry door and the bedroom door. (R-IV-104) The Complainant's body was located in the master bedroom. The area around the Complainant was in disarray. (R-IV-105) Carpenter said it appeared that the body had been moved from an area near the dining room entry area into the bedroom area. (R-IV-106) Carpenter noted the appearance of numerous wounds on the Complainant's face and neck. (R-IV-106) Carpenter also noted that there were shoe prints throughout the house. (R-IV-110) He also noted the appearance of what appeared to be a gouge mark near the pantry room door. (R-IV-126) Carpenter also observed a scabbard (sheath) that holds the sword, laying next to the Complainant. (R-IV-130) He described the sword as an ornamental or collector type sword. (R-IV-131) Blood evidence was found throughout the location including on the ceiling and in the light fixture in the bedroom. (R-IV-132) When Carpenter searched in the bathroom area, he located a box located inside a hollowed-out area on the bathroom cabinet. Inside the box, Carpenter found what appeared to be jars of Marihuana. (R-IV-135) The crime scene was processed for latent fingerprints with negative results. (R-IV-139-141) The scene was also processed for DNA evidence. (R-IV-141) Carpenter also photographed various shoe prints within the house. (R-IV-146, 147) Carpenter recovered knotted clothing from the top bunk bed in the children's room. (R-IV-154) On December 23, 2011, Carpenter became aware of the fact that a vehicle belonging to the Complainant was found. (R-IV-155) Carpenter processed the vehicle for fingerprints and DNA. (R-IV-156) The vehicle was found partially submerged in water. The vehicle that was outside the water had been burned. (R-IV-

2

157) A cell phone, shotgun shell, and a lighter were recovered inside. These items were tested for DNA and processed for fingerprints. (R-IV-157)

During cross examination, Carpenter opined that the beating with a blunt force object appeared to have occurred in front of the pantry in the kitchen area. (R-IV-160) He was unable to tell where the beating actually began. (R-IV-161) Although blood was found in the couch area, Carpenter indicated that he did not believe the beating took place there. (R-IV-162) He indicated that the blood on the couch could have been stains transferred from someone having blood on their hands or other surface onto the couch. He agreed that may not have been how the blood got there. (R-IV-162,163) While Carpenter indicated his opinion would not be that the dragging occurred from the couch area past the pantry and into the bedroom area, he admitted he could not positively state that it did not happen that way. (R-IV-164) He said that from the drag marks it was possible that someone had taken the Complainant by his feet and dragged him into the bedroom, and that it could have been done by one person. (R-IV-164) Carpenter found a claw hammer at the scene which was tested for blood with negative results. (R-IV-165) Carpenter described the sword having a fabric wrapped around it, but he was unable to state whether DNA would be more likely to have been found on that surface. (R-IV-166) He also acknowledged that if DNA was found on the scabbard (the sheath) that would indicate that someone handled the scabbard. (R-IV-166) He searched the home for fingerprints and found none belonging to Appellant. (R-IV-167). When asked about the gouge mark on the pantry door, Carpenter was unable to state whether it was caused by a sword, a hammer, or some other object. (R-IV-168) Carpenter opined that the area of most trauma occurred in the pantry area, but he was unable to state whether the Complainant had been clubbed or hit over the head at the couch area. (R-IV-172,176)

3

Marie Lopez, the Complainant's wife, testified she was working at My Fit Foods in December, 2011. (R-IV-185) Her husband was doing some remodeling work at his uncle's home, but he was also receiving unemployment. She indicated that he predominately took care of their kids while she worked. (R-IV-186,187) She acknowledged that her husband used Marihuana. Leading up to the date of December 20, 2011, Marie Lopez indicated that she became suspicious of one of the individuals her husband was hanging out with ( not involving any of the defendants in this case). (R-IV-191) At the time of her husband's death, she had no idea that her husband was dealing drugs out of their home. (R-IV-191) Marie Lopez indicated that had she known, she would not have been okay with his drug dealing. (R-IV-191) She was unaware of a secret compartment underneath the bathroom counter in which her husband stored dope. (R-IV-192) Marie Lopez indicated she did not know who Appellant was. She also did not know Joseph Facundo. The only individual she knew was Amber Thornton. (R-IV-193) She described Amber as just somebody that she had met. (R-IV-194) On December 20, 2011, the Complainant was to watch the children while Marie Lopez was at work. (R-IV-196, 197) Lopez was unable to reach her husband by phone throughout the day. (R-IV-198) When she and the Complainant's cousin (Shonte) arrived at the home, Lopez noted that their black Chevy Tahoe SUV was not in the driveway - this concerned her. (R-IV-200) Upon entering her home, Lopez noticed that chairs were turned over and Julianne was sitting on the couch by herself. Her husband Russell was laying on the floor in the bedroom with blood everywhere. (R-IV-202) After attempting CPR on her husband, and not getting a response, Lopez walked into the bedroom and found the children with their hands tied behind their back. (R-IV-204) Lopez took the children out through a window so as not to disrupt the scene. (R-IV-206) Lopez identified a photograph of a safe taken from their home

4

and indicated that other property, including a TV, a game system, a jewelry box, and the SUV were all missing. (R-IV-209)

During cross examination, Lopez acknowledged that she only made $12.00 per hour working at My Fit Foods, while her husband was on unemployment. (R-IV-211,212) After detailing some of her expenses, including a $700 payment on the Tahoe SUV, Lopez indicated that she would be surprised to have heard that her husband had $3,000 to $4,000 cash on hand on the night of his death. (R-IV-213) Lopez admitted that when she spoke with Sergeant Miller she told him that she was surprised. She never saw the drugs and had a huge issue with that. She also told Miller that she had been talking about leaving the Complainant because of the drug issue. (R-IV-214) In her interview with Sergeant Miller, Lopez never told him that her husband was working for his uncle doing a remodeling job. The incident that she was concerned about involving another individual and her husband turned out to be where a man gave Lopez money for a watch. Lopez told her husband that he was getting involved with the wrong people. She described the man as scary, having a tattoo on his neck. (R-IV-215) She gave Miller the names of several individuals that she found to be questionable, including Mike T, Blake and Amber. (R-IV-215, 216) Lopez had not made the connection between those people and her husband's drug use or drug sales. (R-IV-216) Additionally, Lopez questioned whether or not an individual known as Jafar could have been involved in something like murdering her husband. (R-IV-218,219) Despite her concerns about her husband's drug use, and drug sales, Lopez still maintained that she did not believe that her husband was putting the kids in harms-way because of it. (R-IV-219)

Craig Clopton with the Harris County Sheriff's Department Homicide Division testified that he was assigned this case. (R-IV-223) After describing the initial work at the

scene on Plantain Drive, Clopton noted that a 2007 Chevy Tahoe was missing. (R-IV-226) As part of his investigation, Clopton made arrangements for two of the children who were found at the crime scene to be taken to the Children's Assessment Center for interviews. (R-IV-230) The children eliminated possible suspects that Clopton was looking into at the time. (R-IV-233) Clopton's opinion was that robbery was the motive behind the killing. (R-IV-233) Additional names were developed in his investigation, including Amber Thornton and Joseph Facundo. (R-IV-236) On December 28, 2011, Clopton interviewed Amber Thornton when she voluntarily came to the homicide department. (R-IV-237) Clopton described the interview with Thornton as lengthy. Clopton indicated that an additional person (the Appellant) was developed and that his focus sharpened on Joseph Facundo. (R-IV-237) After the statement of Amber Thornton on December 28, 2011, Clopton made his primary suspects as Thornton, Joseph Facundo, and Tony Escobar. (R-IV-238) Clopton put together a photo spread of this various individuals and presented them to Caden Lopez, one of the children. (R-IV-240) Caden identified the photographs of each of the individuals. (R-IV-241-243) Clopton then took this information to the District Attorney's Office where he obtained capital murder charges on all three of the suspects. (R-IV-244) Thornton was arrested when she was walking down a street. (R-IV-246) Clopton, along with his partner Miller, went to Laredo, Texas, where Joseph Facundo and Tony Escobar were in custody at the Webb County Jail. (R-IV-248) At the Webb County Jail, Clopton took a statement from Appellant as well as DNA samples. (R-IV-249) After his arrival in Houston from Laredo, Appellant initiated a conversation with Clopton. On January 4, 2012, Clopton received a tip and went and spoke with an individual named David Tillman. (R-IV-253) Clopton met with Tillman who provided a small safe. (R-IV-254) Clopton also explained that he made efforts to locate the

murder weapon or weapons in the case. He indicated that Escobar had told him that the hammer that was used to kill Russell Lopez was thrown in the water not far from where the Complainant's Chevy Tahoe was recovered. (R-IV-255, 256) This hammer was never recovered by the Marine Division divers went looking for it. (R-IV-256, 257) Clopton then went to Appellant's house and met with his mother who provided a cell phone to Clopton. (R-IV-257)

During cross examination, Clopton was asked how long it took him to determine that it was a robbery home invasion after observing the scene. When pressed for a time line, Clopton refused to provide any specifics. Clopton stated that the could not tell exactly when he formed the opinion, but he would acknowledge that it was not more than a day later. (R-IV-263) When asked if it was within 24 hours of the initiation of his investigation, Clopton responded by saying, "*Well, you're trying to pin me down on an exact time frame, which I'm not going to adhere to.*" (R-IV-263) When asked to acknowledge that he was investigating capital murder, Clopton merely said, "*At some point, yes.*" (R-IV-264) Clopton did acknowledge that he was able to determine that this was a drug related robbery murder. (R-IV-264) When asked if that wouldn't have been within the first 24 hours, Clopton again refused to answer directly by stating, "*I just can't - -, you're trying to box me in on that. I don't know at which point I made the determination it was robbery or drug related.*" (R-IV-265) He went on to state, "*You keep going back to the same time frame. I can't give you a time frame.*" (R-IV-265) Clopton failed to investigate any burglaries within a five mile radius of Russell Lopez's house as part of his investigation. (R-IV-267) When asked whether, in his experience as a detective, Clopton found that drug dealers would buy stolen property from customers who were committing burglaries and trade the property for drugs or money,

7

Clopton acknowledged that was true. (R-IV-267, 268) Clopton also agreed that dealing drugs out of a person's house is dangerous, not only to the individual but to their family members in the house. (R-IV-270)

When Clopton was questioned about interrogation techniques, including the Reid technique developed by a former police officer in Chicago, Clopton acknowledged being familiar with it. (R-IV-271) Clopton indicated that once he was in the homicide division he went through the Reid technique process. (R-IV-271) Clopton was reluctant to acknowledge his use of the Reid method or how it actually played a role in this case. Clopton denied that once Amber Thornton began telling her story to him that his interview with her became an interrogation. (R-IV-273,274) Although Clopton acknowledged having reviewed Thornton's statement prior to testifying in court, he was unable to remember whether he had floated his theme of how the murder took place to Amber Thornton when he was interrogating her. (R-IV-274) Clopton acknowledged that as part of his interrogation technique he was allowed to lie to an individual. He also indicated another technique when interviewing a suspect is to offer them a way out. (R-IV-275) When specifically asked whether, when he was interviewing Thornton, he give her a way out, or did he direct her to make incriminating statements in the case against Joseph Facundo and Tony Escobar, Clopton responded by saying, "*Did I do what?*" (R-IV-275) When the question was repeated to him, Clopton merely said, "*I can't say I agree with that.*" (R-IV-276) When Appellant's counsel continued to press Clopton asking him "*Did you continually on more than one occasion - - on this occasion during this interview with her, this interrogation, did you continue to float the theme to her that this was a robbery murder and that it had been planned before going over there.*" Clopton's response was, "*It was an interview.*" (R-IV-276) When questioned whether it was

8

robbery murder that had been planned before going to the Lopez house, Clopton again refused to give a direct answer, merely stating, *"It was an interview. It was not an interrogation."* (R-IV-276) Once again, when counsel asked, *"Did you float that theme to her."* Clopton responded, *"You asked me that. I don't know if I floated that to her."* (R-IV-277) When Clopton was asked whether he recorded his interrogation of Thornton, he indicated that he did an audio recording and that he intentionally chose not to do a video. He then attempted to explain that the Harris County Sheriff's Office was having problems with their video equipment. (R-V-7) He acknowledged having listened to the recording after it was taken on December 28, 2011. (R-V-8) Clopton finally admitted that after Caden Lopez made his identifications, it was safe to say that Clopton's theory was that it was a planned robbery that resulted in a murder.(R-V-9) He qualified his response by stating that his theory was that the Complainant was robbed and that it was planned. Clopton indicated that who exactly was involved in it, and what exactly everybody's role was, he did not know. (R-V-9) He further admitted that he had no direct knowledge that there was a conspiracy or a plan to rob Lopez. (R-V-10) Clopton was asked whether he was aware of what Thornton's story was now after accepting a plea bargain deal, to which he said, *"I don't know what the parameters of that is."* (R-V-10) Clopton did acknowledge that he considered Thornton a co-conspirator acting with Joseph Facundo and Tony Escobar in the commission of the crime that resulted in the death of Mr. Lopez. (R-V-12) Clopton determined that Frances Tillman had opened the safe which belonged to Lopez and that Mr. Tillman knew Amber Thornton and Joseph Facundo. (R-V-19) Clopton was aware that an individual in a white Honda brought the safe to Tillman. Clopton never omitted the Honda or the driver of that vehicle. (R-V-20) When Clopton was asked whether he spoke with an individual named James Wayland aka "Blinkie," he again

9

became evasive. When asked whether he had taken a statement from Blinkie, Clopton said, "*It was a statement. I didn't take a statement from Blinkie.*" (R-V-21) When asked how he would categorize the conversation he had with Blinkie, he responded, "*I don't know what you mean how did I categorize it.*" (R-V-21) Clopton acknowledge that he surreptitiously recorded "the conversation" and then differentiated a conversation from the statement because he didn't tell the individual that he was "taking his statement from him." (R-V-22) When Clopton went to Laredo to question Tony Escobar, he indicated that he took a recorded statement. (R-V-23) Clopton once again indicated that he decided to take an audio recorded statement. When asked whether the Webb County video equipment was broken, Clopton responded, "*I have no idea. I'm not required to video. It is strictly up to my option, I prefer to audio it.*" (R-V-24) Clopton did not ask the Webb County officials whether they had video equipment. Interestingly, when Clopton was asked whether he would agree as a homicide investigator that if you have a video of someone's statement, whether it was Amber Thornton's or Tony Escobar's, or anyone, that it eliminates issues with whether or not the statement was coerced or intimated or involuntary. Clopton responded, "*No.*" And when again asked "*Wouldn't you agree with that?*" Clopton again responded, "*No.*" (R-V-25) When asked whether it eliminates someone claiming it was involuntary, because you could see them on the screen and see them on TV, Clopton stated, "*I disagree with that.*" (R-V-25,26) **In an interesting revelation, Clopton went on to state "*And that's through my experience. I have had individuals say that we were on video, that I took them out of the room and twisted their head and brought them back in and made them say things. So it doesn't eliminate that.*"** (R-V-26) Although Appellant voluntarily gave DNA swabs, Clopton was not able to get voluntary swabs from Amber Thornton or Joseph Facundo. (R-V-26) On

10

January 3, 2012, Clopton got word that Appellant wanted to speak with him. When Clopton went to speak with Appellant, Clopton recorded his statement on audio. When Clopton was asked whether he inquired whether or not the jail at the Harris County Jail had video equipment, he indicated that he did not inquire about that. (R-V-27) Clopton never determined who the women were that drove Appellant and Facundo to the border. (R-V-29) Once again, when Clopton was asked about the "statement" he took from Mr. Wayland aka "Blinkie," Clopton again argued that it wasn't a statement but it was a report. (R-V-29) He did, however, acknowledge that it was a conversation connected to his investigation of the murder of Russell Lopez. (R-V-30) Clopton's investigation never determined what happened to the jewelry which was taken from Russell Lopez's home on the night he was murdered. (R-V-31)

Raymond Campos, a crime scene investigator with the Harris County Sheriff's Department, was called out to recover a vehicle that was involved in the investigation. (R-V-40) The vehicle was found partially submerged in a body of water . (R-V-43) The portion of that vehicle that was out of the water was totally burned. (R-V-44) Campos was able to confirm that the vehicle belonged to Russell Lopez. (R-V-45) Campos noted that the keys to the vehicle were still in the ignition when it was recovered. (R-V-47) Among the items recovered near the scene of the vehicle were a disposable lighter, an Academy sports bag, as well as a charcoal lighter bottle. (R-V-52)

Amber Thornton who grew up in the Katy area, testified that she was 24 years of age and had a five year old son. (R-V-55,56) After admitting that she had been convicted of theft and sentenced to one year in the Harris County jail, Thornton admitted that she had been involved in drugs, including cocaine, marihuana and pills such as Lorcet and Lortab. (R-V-59)

11

When testifying, Thornton was housed in the Harris County Jail on medication for anxiety and depression. Thornton acknowledged that she was charged with capital murder, along with Appellant and Joseph Facundo. (R-V-60) Thornton also acknowledged that she learned she could be facing either the death penalty or life without parole. After her arrest, Thornton was appointed a lawyer (Charles Brown). (R-V-60) At some point after being charged with capital murder, Thornton expressed an interest in wanting to cooperate, possibly testify against either of her co-defendants. (R-V-61) Thornton told the jury that she had pled guilty to the reduced charge of aggravated robbery. She claimed she had not been promised anything for her cooperation. (R-V-63) Thornton testified that she was eligible for probation. (R-V-64) She testified that she, Joseph Facundo and Appellant, would do drugs together. (R-V-66) Thornton explained that in December of 2011, she was 22 years of age, Joseph Facundo was 18 and Appellant was 17. (R-V-67) She identified Blake Kramer as her boyfriend in December of 2011. (R-V-67) In December of 2011, Blake was in jail on a burglary of a habitation charge. (R-V-68) Thornton indicated that she knew Russell Lopez (the Complainant) because he was the neighborhood drug dealer. (R-V-69) She had known Lopez for 5 or 6 months prior to his death. (R-V-69) Thornton admitted that the drugs purchased from Lopez included cocaine, pills and marihuana. She also indicated that she observed Facundo buy drugs from Lopez. (R-V-70) Thornton never saw Appellant buy any drugs from Russell Lopez. (R-V-70) She indicated that as far as she knew Russell Lopez was Tony Escobar's connection for drugs. (R-V-70) Thornton admitted that on occasion she would go to Russell Lopez's house for drugs. (R-V-71) Thornton described a vacant house near where her parents lived which they called "Vaco" where they would hang out and do drugs. (R-V-73) She testified that she would go to the vacant house along with Joseph Facundo and

12

Appellant. (R-V-76) Thornton described her relationship with Joseph Facundo as pretty close. (R-V-78) None of the three (Thornton, Facundo, or Escobar) had a car. (R-V-79,80) Thornton reconfirmed that Russell Lopez's relationship with Tony Escobar was not really that much. Thornton stated that Lopez had a closer relationship with her and Joseph Facundo.(R-V-82) Thornton explained that Joseph Facundo was mad at Russell Lopez over a gun that was missing. (R-V-83) On December 20, 2011, Thornton explained that after getting off work from Signature Dry Cleaners she went home, sat outside and smoke legal weed (Kush). She indicated that at the time her son was in day care. (R-V-83, 84) After getting her son from day care at around 8:00 p.m., Thornton went to the "Vaco" to get high. (R-V-84,85) Appellant and Joseph Facundo were both at the house when Thornton arrived and they smoked marihuana while Thornton smoked her "Kush." (R-V-85) She stated that she smoked her "Kush" and not real marihuana because she was on probation. (R-V-86) During the 20 or 30 minutes that they stayed in the vacant house smoking, Thornton said that Joseph Facundo came up with a plan to rob Russell Lopez to get money and drugs. (R-V-86) Thornton stated that the plan had been discussed on a previous date by Facundo. She explained that the plan was for them to go over to Lopez's house to sell Lopez a laptop for money that Thornton owed to Lopez. (R-V-87) She was to sell the laptop to Lopez and get three 20's of coke, which meant three bags of coke, each valued at $20.00. (R-V-87) Thornton explained that the laptop belonged to Appellant and that it was at the vacant house when she arrived. (R-V-88) Thornton explained that the "plan" was for them to go over to Lopez's house and then Facundo was going to hit Lopez over the head with a hammer and Appellant was going to tie up the kids. The three were going to steal all of Lopez's stuff and load it in the Tahoe and leave. (R-V-88) Thornton indicated that she did not know whether kids would actually be at

13

the house. She indicated that the hammer came from Facundo and that she saw it while they were inside the vacant house. (R-V-89) Thornton claimed Facundo kept the hammer in his pocket. (R-V-90) Thornton further explained that Facundo was upset and mad with Lopez because he believed that Lopez had stolen a gun from him. (R-V-90,91) Thornton stated that when she entered the house she observed Lopez sitting in a chair in the dining room feeding his baby. (R-V-93) When they entered, they handed the laptop to Lopez and then put it on the table and they grabbed three 20's of coke. (R-V-94) Thornton explained that Joseph Facundo was standing behind Lopez as was Tony Escobar. She stated that when Lopez took the laptop, Tony Escobar took the bags of cocaine. (R-V-97,98) Thornton then said that Facundo got the hammer out and hit Lopez in the back of the head over and over. (R-V-98) She stated that Lopez then fell to the ground right next to the chair. (R-V-98) She described that the baby was sitting in the high chair. Facundo told her to get the baby and to make the baby stop crying. At this time, Appellant was in the room with the other children. (R-V-99) Thornton said that at the very beginning when Facundo was striking Lopez, Appellant had already left the dining room and went into the other back room. (R-V-99) She described Appellant being gone for 3 to 4 minutes. (R-V-100) Thornton then described looking through cabinets, opening drawers and finding jewelry and a gun and that they took those items and piled them up. (R-V-101) Thornton explained that the whole time that Facundo was hitting Lopez with the hammer, it was at one location. (R-V-102) Thornton explained that they found the car keys and that Facundo and Appellant placed the items into the Tahoe. (R-V-102) She explained that both Facundo and Appellant drug Lopez's body into his room. (R-V-103) Thornton said that Facundo got a sword and was about to cut Lopez's throat or stab him with it when he told her not to look. (R-V-104) She stated that Facundo and Appellant were both

14

in Russell's room at that time. (R-V-104) Thornton did not see what happened inside the bedroom. She explained that Joseph Facundo was the one who was responsible for using the sword on Russell Lopez because he was holding it in his hand. (R-V-105) Facundo drove the Tahoe and they went back to the vacant house where they unloaded the items taken from Lopez's house. (R-V-107) They placed the items in the attic of the vacant house. (R-V-107) Thornton acknowledged that she had blood on her feet, shoes and clothing. She explained that she had to go home by 10:00 p.m. because she had a curfew placed on her by her mother and father. (R-V-109) Thornton then explained that she took her clothing and placed them in a bag and threw them away. (R-V-109) Thornton explained that the Tahoe was taken to an area called "the Cliffs" where they would swim, have bonfires and smoke weed and party. (R-V-110) She learned about what happened to the Tahoe when Joseph Facundo explained things to her later. (R-V-110) She did not accompany Facundo to the Cliffs area. (R-V-110) Thornton was still involved in the situation and planned to sell jewelry and she helped find someone to open the safe taken from Lopez's home. (R-V-111) Thornton contacted her friend David Tillman to open the safe. (R-V-111) She retrieved the safe from the attic in the vacant house and, along with Joseph Facundo, went to David's house. (R-V-112) When Tillman opened the safe, legal papers were found inside that included the name of Russell Lopez. The papers were thrown away. (R-V-115) The safe was left with David Tillman. (R-V-115) Thornton claim she only received a couple hundred dollars. (R-V-115,116) Thornton also got jewelry which she sold. (R-V-116) She acknowledged that on December 28, 2011, she gave a statement to Detective Clopton with Sheriff's Department. She indicated that between the time of the killing and the time of her statement, she was staying high, doing a lot of cocaine and selling some of the stolen property. (R-V-117) Thornton admitted that when she spoke

15

with Clopton she did not tell him the truth. Thornton claimed because she was scared of her involvement. (R-V-118) She indicated that she was not honest with the police because she didn't want them to know about her involvement in the case. (R-V-119) She also admitted that she was not honest with the police about the vacant house because she didn't want them to know about it. There was still property in the vacant house so she was not honest with them about it. (R-V-119) Thornton said that Facundo and Appellant received money as well as property. (R-V-120)

During cross examination, Thornton acknowledged that she was on mood stabilizers: Thorazine, Klonopin and Mamictal. (R-V-121) Thornton testified that she had been continuously confined in the Harris County jail since her arrest on December 28, 2011. (R-V-122) In cross examining Thornton regarding her motive for changing her testimony, by testifying against co-conspirators to get out of jail and her desire to get out of jail, Thornton stated that: she was basically being warehoused and contained. She testified that there were no educational or learning job skill opportunities while in jail. (R-V-124) She indicated that she had had several problems with other inmates since being in jail. (R-V-124,125) Thornton stated that she had been disciplined and lost her commissary rights. (R-V-125) She testified that the last time she saw her son was two and one-half years ago and that she wanted to see her son again. (R-V-125) Thornton stated that if she got out of jail, she would be able to have a life with her son. (R-V-126) She also stated that she had gained 100 lbs since being incarcerated. (R-V-127) She told the jury it had been very stressful for her being in jail, Thornton indicated that she was made aware that she might have an opportunity to get out of jail by cooperating with the prosecution about one month before testifying. (R-V-127) She stated that the reason she had not pled guilty earlier was because the prosecution hadn't

16

offered her anything. (R-V-128) Thornton explained that she was the moving force behind the plea deal and that she had gone to the State, the State had not come to her. (R-V-128) Thornton stated that she was asking for probation on her aggravated robbery case. She stated that she was not going to know the outcome until she testified against Appellant and also Joseph Facundo. (R-V-129) She agreed that she had a lot riding on the testimony. She further agreed that she got off death row and she might be home with her son if everything worked out right for her. (R-V-129) She acknowledged that she had met jointly with the prosecutor and her defense attorney to prepare for her testimony in court against Appellant. (R-V-130) She stated that between December 11, 2011 and December 28, 2011, she had not consulted with an attorney but in fact was trying to sell the jewelry taken from Lopez. (R-V-131) She denied asking David Tillman to chop up a truck or if he knew how to go about doing that. (R-V-131) Thornton acknowledged that she wasn't sure whether she was going to be able to get away with this case. (R-V-131) Thornton admitted that when she met with Clopton she told him she was going to honest with him, but in fact was not honest. (R-V-133) She admitted that she had lied during that statement. She claimed that she was going to be honest regarding everything she testified to in court. (R-V-133) Thornton told the jury that Russell Lopez was the neighborhood drug dealer and in fact had sold to teenagers and other kids. She stated that it wasn't just marihuana, it was across the board - cocaine and pills. (R-V-134) She also acknowledged that some of those kids would take stolen property to Lopez and sell it to him, just like she said they were trying to do on the night of Lopez's death. (R-V-134) While Thornton professed to know the plan. She indicated that there was never any discussion about Marie Lopez, or whether she would be there. Initially, Thornton said that they didn't know whether the kids would be there but they had planned to tie them up if they were. (R-V-135)

17

She stated that no one had gotten any tape or rope or made plans to do that in order to tie up the kids. (R-V-135) Thornton admitted that the story she told the jury on direct examination, when questioned by the prosecutor, was different than the story she told Sergeant Clopton back on December 28, 2011. (R-V-144) She admitted that on December 28, 2011, she told Clopton there was no plan. In court she stated there was a plan. (R-V-145) Thornton confessed that she never told Clopton that they had been at the vacant house because she didn't want him to know the part that she played. (R-V-145) She also confessed that she made up a completely different story about how they were walking down the street and ran into Appellant and Appellant was taking a laptop over so they decided to go over with him. (R-V-145) Thornton also agreed that although she told Clopton that she had a debt with Lopez, and that is why they were using the laptop to pay the debt off, it was really true that they were intending to rob and murder Lopez all along. (R-V-146) Additionally, Thornton admitted that her story to Clopton on December 28, 2011, about how Joseph Facundo had taken her straight back to her home after Facundo had murdered Lopez, was not true. (R-V-146) She agreed that there were a lot of differences between what she said initially to Clopton, explaining that she didn't have an opportunity to consult with a lawyer or prepare a defense, and what she was saying in court. (R-V-147) She agreed that it was to her advantage to be untruthful on December 28, 2011 because she didn't think she was going to get in trouble with the story she told Clopton. (R-V-147) Thornton admitted that it was to her advantage to lie to the police. (R-V-147) She also admitted and agreed that it was pretty bold of her to stand up to two experienced homicide detectives - and that it took guts and willpower to do so. (R-V-148) In further cross examination, Thornton agreed that she was smoking marihuana while she was on probation and that this was a violation of probation. She agreed

18

that she lied to the court and lied to a probation officer about following the rules of probation. She went on to state that it was convenient for her to do because it served her purpose. Thornton said if she wanted to smoke dope, she did so, and then just lie to everybody about smoking. (R-V-152) Thornton denied telling anybody about the murder between the date of the offense and her arrest date. She stated she spoke with Jim Weyland aka Blinkie and he thought that she was acting strangely after the murder. (R-V-153) She stated she was buying a lot of cocaine and the neighbors were talking about the murder that had happened. (R-V-153) Thornton noted that even in talking with Blinkie she didn't want to tell nobody the truth. (R-V-156) Thornton also admitted that she had some jewelry that she had taken over to David Tillman's house. She stated that she had lied to Sergeant Clopton and told him she never got any jewelry. Thornton never saw Joseph Facundo hand the scabbard with the sword to Appellant. (R-V-158) During continuing cross examination, Thornton indicated that her meetings with the prosecutor were recorded. (R-V-168,169)

Frances David Tillman, who had been convicted of possession of a controlled substance, testified that he knew both Amber Thornton and Joseph Facundo, but did not know Appellant (Tony Escobar). (R-V-174) Tillman testified that four or five days after the murder of Lopez, Thornton came to his house trying to sell (or get rid of) watches and a ring. On a subsequent visit, Thornton came to Tillman's house only with Joseph Facundo. (R-V-178) Tillman stated that later, when he had to open the safe, all three individuals were present. (R-V-181,182) The State and Appellant later entered into a stipulation that Sergeant Clopton had reviewed his report and there was nothing in Frances Tillman's statement about Appellant showing up later at the time the safe was opened. (R-VI-6) Tillman opened the safe and found papers inside with the name Russell Lopez - he became suspicious. (R-V-182)

19

Tillman ultimately turned the safe over to Sergeant Clopton. (R-V-183)

During cross examination, Tillman said Thornton talked to him about trying to dispose of a truck. Thornton asked Tillman about a chop shop and he indicated that he did not involve himself with that. (R-V-186) Tillman described Joseph Facundo as acting like it was no big thing to him. He even described Facundo grinning. On the other hand, Tillman described Thornton as being real worried - she looked like something was up and she was real scared and crying. (R-V-189) Tillman also confirmed that Appellant wasn't at the location when there was talk about chopping up a truck. (R-V-189)

Sergeant Clopton was recalled to testify. (R-V-195) Clopton described how he and Sergeant Miller went down to Laredo to pick up Appellant and question him regarding this case. (R-V-197) After warning Appellant of his legal rights, Clopton proceeded to question the Appellant.

Diana Wolfshohl, a DNA analyst with the Harris County Institute of Forensics Sciences, testified that "touch DNA" is basically skin cells being left behind on an object and testing whether there was DNA from those skin cells present on the objects. (R-VI-12) Among the items she reviewed were a scabbard (State's Exhibit No. 76). Wolfshohl's findings and the work on the case were then passed on to DNA for their analysis. (R-VI-27)

Christine Smejkal, a DNA analyst with the Harris County Institute of Forensics Sciences, testified that her analysis revealed there was a mixture of DNA on the scabbard which was collected as evidence in this case. She testified that Russell Lopez and Appellant could not be excluded as possible contributors to the mixture of DNA. (R-VI-42) She testified that Marie Lopez, Joseph Facundo and Amber Thornton were excluded as contributors to this mixture. (R-VI-42) Smejkal testified that of all the other items that were

20

submitted for analysis, Appellants DNA did not appear on any of those items. (R-VI-47) She

testified that there was no DNA on the sword that was found on the body of the Complainant.

(R-VI-50) Ultimately, she testified that because Appellant could not be excluded as a

contributor to the DNA found on the scabbard, it's possible he touched the scabbard. (R-VI-

50) She agreed that the assumption could be made that Appellant wasn't wearing gloves

when he handled the scabbard, if he handled it. (R-VI-51) When questioned about the

absence of DNA on the sword handle, she stated that if an individual was not wearing gloves

there would be a pretty good chance of getting DNA. (R-VI-52)

Roger Milton, Jr., Assistant Medical Examiner from the Harris County Institute of

Forensics Sciences, testified regarding his autopsy results. (R-VI-54) Milton explained that

the Complainant had extensive blunt and sharp force injuries primarily of his head and neck

region and some on the front of his chest. (R-VI-62) He also observed the presence of two

narrow objects penetrating into the soft tissue in what he referred to as potentially chop

injuries. (R-VI-63) Dr. Milton testified that the Complainant had sustained at least 16 distinct

blunt force injuries to the head. (R-VI-63) The injuries to the Complainant's face were

extensive and very destructive with fractures. (R-VI-64,65) Milton also observed perforating

wounds on the body of Russell Lopez, including a stab wound to the right upper chest that

went through his lung. (R-VI-68) Dr. Milton testified that a sword shown to him (State's

Exhibit No. 94) was capable of inflicting the type of injuries sustained by the Complainant.

He indicated that there was very little hemorrhage along the wound track indicating that the

injury was consistent with either a peri-mortem (around the time of death) or even postmortem

injury. (R-VI-100) Dr. Milton opined that the Complainant's cause of death was multiple

blunt and sharp force injuries of the head, neck and chest. He determined that the manner of

21

death was homicide. (R-VI-107)

Caden Lopez testified that on December 20, 2011, he was at home with his cousin Mabel. He testified that his father had some friends over that afternoon. (R-VI-124) He testified that his father was sitting at the kitchen table and that his sister was in a high chair. (R-VI-125) A man walked into his room carrying his sister's clothes, and then the man said that they were going to play cops and robbers. The man then tied them up and put them on the bed. (R-VI-126) Caden was eventually able to loosen up the clothing that was tied around him. He then helped his cousin Mabel. (R-VI-127) Caden described the process of being tied up taking close to 8 minutes. (R-VI-128) He stated that the man who tied them up made no threats at all. (R-VI-128) He also said he knew something bad was going on in the other room and that he observed a women carrying his little sister. (R-VI-131) He was unable to make out exactly what was being said in the other room, but testified that he heard two voices in his dad's bedroom. (R-VI-134) Caden then identified Appellant as one of the individuals that had been inside his home with his father on the day that he was murdered. (R-VI-141) The State and Appellant rested and closed the case. (R-VI-141-143)

The jury found Appellant guilty of capital murder as charged in the indictment. (R-VII-57) Appellant to life in the Texas Department of Criminal Justice. (R-VII-60) The prosecutor stipulated that Appellant, Tony Escobar, had a date of birth of August 15, 1994. The offense occurred on December 20, 2011, making Appellant 17 years old at the time of the offense was committed. The prosecutor confirmed that this would make Appellant eligible for parole on his life sentence after 40 calendar years. (R-VII-61,62)

22

## POINT OF ERROR NUMBER ONE

**THE EVIDENCE IS INSUFFICIENT AS A MATTER OF LAW TO SUSTAIN THE JURY'S VERDICT FINDING APPELLANT GUILTY OF CAPITAL MURDER BEYOND A REASONABLE DOUBT WHICH REQUIRES THE ENTRY OF A JUDGMENT OF ACQUITTAL (R-IV-VI)**

## POINT OF ERROR NUMBER TWO

**THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR INSTRUCTED VERDICT OF NOT GUILTY AT THE CLOSE OF THE STATE'S CASE (R-VI-142,143)**

The Statement of Facts and Argument and Authorities under these two Points of Error are grouped together pursuant to **Rule 38.1(f) of the Texas Rules of Appellate Procedure**.

## STATEMENT OF FACTS

The full Statement of Facts appearing at the beginning of this brief is incorporated herein by reference for all purposes. A short summary of the salient facts appear below:

The State's evidence critically hinged on the testimony of Amber Thornton - a co-defendant to Joseph Facundo and Appellant. Up until the eve of Appellant's trial, Thornton was also charged with the offense of capital murder in the death of Russell Lopez - a person Thornton described as the neighborhood drug dealer. Just weeks before Appellant's trial was to begin , Amber Thornton was awarded a plea bargain in exchange for her testimony against Appellant at his trial. Thornton's capital murder charge was dismissed by reducing it to the offense of aggravated robbery. Thornton's punishment was to be fixed after she testified against both Appellant and Joseph Facundo.

When Thornton first discussed this matter with homicide Sergeant Craig Clopton on December 28, 2011, her version of the events differed wildly from her trial testimony. From claiming she had an innocent encounter with Appellant while she walked down the street to

23

sell a laptop - to testifying about a pre-planned conspiracy to rob Russell Lopez, Thornton provided the State with evidence that was otherwise non-existent. During cross examination, Clopton admitted that he had been provided no direct evidence that there was a conspiracy or plan to rob Russell Lopez when speaking with Thornton. (R-V-10)

Other witnesses testified about the condition of Lopez when he was found laying on the floor of his home. Others testified about the relationships between the individuals involved, while others testified about scientific and forensic testing that was done. The sum total of the evidence failed to establish little more than that Appellant's DNA was found on a scabbard (sheath) at the scene. There was no evidence offered to establish that Appellant ever used a sword or scabbard to assault the complainant. There was no evidence offered that Appellant struck the complainant with a hammer or stabbed the complainant with a sword. Thornton's testimony established that Facundo possessed a hammer and that he was holding a sword and told her not to look just before stabbing the complainant. Thornton's testimony that several days later Appellant was present with her and Facundo when she had a friend open a safe taken from the complainant's home, was refuted by Sergeant Clopton's statement that Mr. Tillman did not confirm that Appellant was present.

Appellant moved for an Instructed Verdict of Not Guilty at the close of the State's evidence, (R-VI-142,143) The trial court denied this motion. (R-VI-143)

## ARGUMENT AND AUTHORITIES

**Section 19.03(2) of the Texas Penal Code,** provides that a person commits an offense if the person commits murder as defined under **Section 19.01(b)(1)** and the person intentionally commits the murder in the course of committing or attempting to commit robbery. The State is obligated to prove beyond a reasonable doubt that Appellant had the

24

specific intent to cause the death of Russell Lopez.

The burden of proof is on the State to establish beyond a reasonable doubt that Appellant committed the offense alleged. **Hightower v. State, 389 SW2d 674 (Tex. Crim. App. 1965); McCullen v. State, 372 SW2d 693 (Tex. Crim. App. 1964)** This burden of proof is on the State to prove each and every element of the offense beyond a reasonable doubt. **Mullaney v. Wilbur, 421 US 684 (1975) In re Winship, 397 US 358 (1970)**

In Texas criminal jurisprudence, the concept of "legal sufficiency" of the evidence is based upon the law of due process. See: **Gollihar v. State, 46 SW3d 243 (Tex. Crim. App.2001)** citing *In re Winship,* **397 U.S. 358,** where the court expressed it as follows: We expressly hold that the **Due Process Clause** protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

Sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in **Jackson v. Virginia, 443 US 307 (1979):** whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

In **Brooks v. State, 323 SW3d 893 (Tex .Crim. App. 2010)** this Court held there is no meaningful distinction between a **Clewis v. State, 922 SW2d 126 (Tex. Crim. App. 1996)** factual sufficiency standard and a **Jackson v. Virginia, 443 U.S. 307 (1979)** legal sufficiency standard. This Court announced that the **Jackson v. Virginia** legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. The court noted that it bears emphasizing that a rigorous and

proper application of the **Jackson v. Virginia** legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard (especially one that is "barely distinguishable" or indistinguishable from a **Jackson v. Virginia** legal-sufficiency standard). Reversal and acquittal are required under this standard of review, if, after considering all the evidence the jury's finding of guilt is not a rational finding.

In her concurring opinion in **Brooks,** Judge Cochran noted that the **Jackson** Court stated the correct standard must incorporate the prosecution's burden of proof - beyond a reasonable doubt - in a due-process review. The court noted that a reasonable doubt has often been described as one based on reason which arises from the evidence of lack thereof. A reasonable doubt might arise because the verdict is manifestly against the great weight and preponderance of the credible evidence or because there is nothing more than a mere scintilla of evidence to support some element of the offense. Judge Cochran, cited *Black's Law Dictionary*, which states that legal sufficiency of the evidence is a test of adequacy, not mere quantity. Sufficient evidence is "such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded." Judge Cochran went on to state that in criminal cases, only that evidence which is sufficient in character, weight, and amount to justify a fact finder in concluding that *every element* of the offense has been proven beyond a reasonable doubt is adequate to support a conviction. After giving proper deference to the role of the trier of fact, an appellate court must uphold the verdict unless a rational fact finder must have had a reasonable doubt as to any essential element. **Laster v. State, 275 SW3d at 518, citing Narvaiz v. State, 840 SW2d 415 (Tex. Crim. App. 1992)**

The complete record in this case fails to establish beyond a reasonable doubt that Appellant intentionally and knowingly caused the death of Russell Lopez as alleged in the

indictment.

In the absence of proof beyond a reasonable doubt that Appellant was responsible for the death of Russell Lopez, either individually or as a party, a conviction for the offense of capital murder cannot withstand appellate review and the entry of a judgment of acquittal by the reviewing court. The evidence offered by the State's witnesses did not enhance the weight or sufficiency of the evidence on this issue. Viewing the evidence in the light most favorable to the verdict, the appellate court determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.

An appellate court must always address challenges to the sufficiency of the evidence. **Garza v. State, 715 SW2d 642 (Tex. Crim. App.)** Such a review must be conducted when a legal sufficiency challenge is raised, even if the conviction must be reversed on other grounds, because a finding that the evidence is legally insufficient to support the conviction prevents a retrial under the double jeopardy clause of the **Fifth Amendment. Hudson v. U.S., 522 U.S. 93 (1977)** If this Court finds that the verdict is contrary to the evidence presented at trial, this Court can reverse the conviction and enter a judgment of acquittal. **Texas Code of Criminal Procedure, Art. 44.25; Texas Rules of Appellate procedure 43.2©.**

An individual may be held criminally responsible for their own voluntary conduct as well as for the criminal conduct of others. **Texas Penal Code Section 6.01 and 7.01.** One may be criminally responsible for the acts of another as a party, or as a co-conspirator under **Texas Penal Code Section 7.02(a)(2) and 7.02(b).** No evidence was offered at trial that Appellant caused the death of the Complainant. The evidence submitted supports the conclusion that Joseph Facundo took the life of Russell Lopez. The complaining witness

died as a result of multiple blunt and sharp force traumas. The injuries were consistent with the use of a hammer and a sword, both of which were observed in the possession of only Joseph Facundo. Therefore, it can be reasonably concluded that Joseph Facundo took the Complainant's life.

To establish that Appellant was guilty as a party, the State must prove that Appellant, while acting with the intent to promote or assist in the commission of the offense, solicited, encouraged, directed, aided, or attempted to aid another person in the commission of the offense. **Texas Penal Code, Section 7.02(a)(2)**. Mere presence at the scene, either before, during, or after the offense, or flight from the scene, without more, is insufficient to establish party liability. **Valdez v. State, 623 SW2d 317 (Tex. Crim. App. 1979)**. To be guilty as a party, Appellant must have committed some culpable act before or during the course of the offense. **Morrison v. State, 608 SW2d 233 (Tex. Crim. App. 1980).**

The State must prove that at the time of the offense the participants were acting together, each contributing toward the execution of a common purpose. **Ransom v. State, 920 SW2d 288 (Tex. Crim. App. 1996).** A defendant must know he is assisting in the commission of the offense and that intent may be inferred from the accused's words and actions. **Patrick v. State, 906 SW2d 481 (Tex. Crim. App. 1995)**. There was no evidence that would establish that Appellant acted with the requisite intent to carry out a common purpose, i.e. the killing of Russell Lopez. Appellant submits that there was no credible evidence to establish that Appellant and Joseph Facundo were acting together when Facundo killed the Complainant.

The evidence was insufficient to support Appellant's conviction for Capital Murder individually or as a party according to **Texas Penal Code, Section 7.02(a)(2)** because he did

28

not intend to promote or assist Joseph Facundo and/or Amber Thornton in the murder of the Complainant. Capital Murder is a result of conduct offense requiring the specific intent to cause the death of the Complainant. **Hughes v. State, 897 SW2d 285 (Tex. Crim. App. 1994).** The accused must not only intentionally engage in the act that causes the Complainant's death, he must also specifically intend that death result from that act. **Hughes.** To be held responsible under the party liability found in **7.02(a)(2)** of the **Texas Penal Code**, the accused must know of the co-actor's unlawful intent when they act to promote or assist the other's conduct. **Hill v. State, 883 SW2d 765 (Tex. Crim. App. - Amarillo, 1994).** The record in the instant appeal is devoid of any evidence suggesting or establishing that Appellant knew of the "co-actors" unlawful intent as alleged by the State.

An individual can be held responsible for the acts of another if that person conspires to commit a felony offense with another person and that person commits an offense in furtherance of the planned offense and that new offense should have been anticipated as a result of carrying out the conspiracy. A person can be held responsible as a co-conspirator under **Section 7.02(b)** if the accused should have anticipated the victim's murder as a consequence of proceeding with the robbery and the victim's death occurred in the furtherance of that offense. **Ex Parte Thompson, 179 SW3d 549 (Tex. Crim. App. 2005).** Once again, there is simply no evidence in the record to establish that Appellant, (1) conspired to commit a felony offense with either Joseph Facundo and/or Amber Thornton and (2) that he should have anticipated the Complainant's murder as a consequence of proceeding with Facundo and Thornton. Appellant could not have anticipated that Facundo would murder Russell Lopez.

**Article 38.14 of the Texas Code of Criminal Procedure** provides that a conviction

29

cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. Amber Thornton was identified by the court as an accomplice. (CR-I-250) The evidence offered by Amber Thornton failed to establish that Appellant caused the death of Russell Lopez as alleged in the indictment. Thornton's testimony did little more than place Appellant at the scene where Joseph Facundo caused the death of Russell Lopez. Appellant's mere presence in the company of someone identified as an accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony. **Dowthitt v. State, 931 SW2d 244 (Tex. Crim. App. 1996)** After this Court eliminates all of the accomplice testimony from consideration and then examines the remaining portions of the record to see if there is any evidence to connect the accused with the commission of the crime - it will find that Appellant's conviction cannot stand. **Castillo v. State, 221 SW3d 689 (Tex. Crim. App. 2007)**

Whether viewed individually, or collectively, the issues addressed in this Point of Error require reversal based on legally insufficient evidence. Appellant submits that this result will be reached after the Court conducts a rigorous and proper application of **Jackson** and **Brooks**. The jury's verdict was not based on a rational review of the evidence. **Winn v. State, 871 SW2d 756 (Tex. App. - Corpus Christi 1993)**

Appellant submits that even though a jury is charged with the responsibility of determining the credibility of witnesses and the weight to be given their testimony, in this case, as a matter of **Due-Process**, this appellate court should find that the verdict is not right or just, and therefore it cannot stand. Appellant submits that when this Court conducts its

30

**Due-Process** review of the sufficiency of the evidence to support the conviction, even when viewing the evidence in the light most favorable to the verdict, it must find that no rational trier of fact could have found the essential elements of the crime of capital murder in this case beyond a reasonable doubt. **Stobaugh v. State, 02-11-00157-CR (Tex. App. - Fort Worth, January 23, 2014)** citing: **Jackson v. Virginia.**

Where the evidence is insufficient to sustain a conviction on appeal, double jeopardy bars a retrial. **Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); Greene v. Massey, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).**

## POINT OF ERROR NUMBER THREE

## THE TRIAL COURT ERRED WHEN IT ADMITTED THE 911 TAPE INTO EVIDENCE OVER APPELLANT'S OBJECTION (R-II-4,5) (R-IV-8,44)

## STATEMENT OF FACTS

In a pre-trial hearing, Appellant noted his objection that the 911 tape made in this case was irrelevant. (R-II-4,5) The State responded that the tape was factual and, without providing additional details, claimed it went to several of the elements that State was tasked with proving beyond a reasonable doubt. (R-I-5,6)

Appellant renewed his objection to the admissibility of the 911 tape and accompanying business records affidavit at trial. (R-IV-8) In arguing against its admission, Appellant further noted the prejudicial nature of the 911 recording. (R-IV-8)

The trial court overruled Appellant's objections - the business records affidavit and 911 tape were admitted into evidence as State's Exhibits 1 & 2. (R-IV-44) The 911 tape was published to the jury. (R-IV-44)

Appellant urges this Court to listen to the content of the 911 tape in order fully appreciate the nature of the error raised herein. (State's Exhibit # 2) The seven minute 911

31

tape contains the voices of Amanda Shonte Mabe and the 911 dispatcher. Mabe is extremely emotional as the dispatcher tries to convince Mabe to perform CPR on the complainant. The complainant's wife (Marie Lopez) can be heard sobbing and crying while she is trying to take care of her babies. Amanda Shonte Mabe and Marie Lopez offered live testimony before the jury in this case. (R-IV-34,177)

## ARGUMENT AND AUTHORITIES

**Rule 401 of the Texas Rules of Evidence** states that "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

**Rule 403 of the Texas Rule of Evidence** provides that although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

In reviewing the trial court's determination of the probative and prejudicial value of evidence under **Rule 403**, a reviewing court will reverse the lower court's ruling upon a showing of a clear abuse of discretion. **Rachel v. State, 917 SW2d 799 (Tex. Crim. App. 1996)** Reviewing for abuse of discretion requires more than deciding that the trial court did in fact conduct the required balancing between probative and prejudicial values - the trial court's determination must be reasonable in view of all the relevant facts. As a result, if the record reveals that the probative value of the tendered evidence is substantially outweighed by unfair prejudice, then the trial court acted irrationally in admitting the evidence and abused its discretion.

32

While 911 tapes are sometimes admitted to provide a framework within which the State's evidence may be developed, such a "framework" does not reveal itself when listening to the 911 tape in the instant appeal. **Webb v. State, 760 SW2d 263 (Tex. Crim. App. 1988)**

In the instant case, Appellant's explained to the trial court that the 911 tape depicted the call made by individuals after finding the complainant's body. Appellant noted that the tape was not relevant because the State had ample other evidence concerning the discovery of the body and the police coming out to the scene. In light of that other evidence, the evidence contained on the 911 tape was redundant and really not part of the dispute at trial. Appellant objected to the inflammatory and prejudicial nature of the recording. Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis. **Montgomery v. State, 810 SW2d 372 (Tex. Crim. App. 1990)** I n listening to State's Exhibit # 2 (911 tape), this Court will discover that the evidence contained on the tape [the 911 dispatcher urging Ms. Mabe to perform CPR on the complainant and hearing the crying and sobbing of the complainant's wife as she tends to her young children]. Appellant fails to se how this particular evidence was "relevant" (as required by the **Texas Rules of Evidence**) to any issue of consequence in this case. The evidence should have been excluded at trial.

Appellant submits that because the record reveals that the 911 tape was not "relevant" within the meaning of the Rules of Evidence and because the "probative value" of the tendered evidence was substantially outweighed by unfair prejudice to Appellant, the trial acted irrationally in admitting the evidence and abused its discretion. **Rachel.**

33

## POINT OF ERROR NUMBER FOUR

**THE TRIAL COURT ERRED WHEN IT ADMITTED NUMEROUS AUTOPSY PHOTOGRAPHS INTO EVIDENCE OVER APPELLANT'S OBJECTIONS (R-VI-70-80; 82) (SX # 79,80,81,82,83,84,85,86,87,88,89,90,91,92,93)**

### STATEMENT OF FACTS

During its presentation of the evidence, the State sought to introduce numerous color autopsy photographs depicting the appearance of the complainant (Russell Lopez). (R-VI-70-80,82) (SX # 79,80,81,82,83,84,85,86,87,88,89,90,91,92,93)

Appellant objected that the color autopsy photographs were not relevant under **Rule 402,** especially in light of the fact that the injuries and cause of death were not even contested issues. (R-VI-71-73) Amber Thornton, the State's key witness and who was identified as an accomplice as a matter of law, provided no evidence to show that Appellant caused any of the injuries depicted in the numerous color photographs allowed in evidence. Appellant went on to state that if the trial court found the photographs to be relevant, he further objected pursuant to **Rule 403** that the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues and inflammatory nature of the photographs and misleading the jury. The trial court overruled Appellant's objections and admitted State's Exhibits 70 thru 93)

### ARGUMENT AND AUTHORITIES

An appellate court reviews a trial court's admission of photographs into evidence under an abuse of discretion standard. **Perry v. State, 903 SW2d 715 (Tex. Crim. App.)** *cert. denied,* **516 U.S. 977 (1995)** A photograph is relevant only if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. **Rule 401** When the accused

34

objects that the photographic evidence is more prejudicial than probative, the trial court must conduct a balancing test under **Rule 403.** Evidence is unfairly prejudicial when it has a tendency to suggest that a decision be made on an improper basis. **Reese v. State, 33 SW3d 238 (Tex. Crim. App. 2000)** *citing* **Montgomery v. State, 810 SW2d 372 (Tex. Crim. App. 1990)** In conducting the balancing test, the trial court should analyze: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time the proponent will need to develop the evidence; and (4) the proponent's need for the evidence, i.e., whether other evidence is available and whether the fact of consequence is related to a disputed issue. **Montgomery.**

Appellant would show that unlike the case of **Flores v. State, 299 SW3d 843 (Tex. App. - El Paso, 2010 - pet. ref'd)** where the court found no error because of the overwhelming evidence of guilt, the admission of the color autopsy photographs constituted error which had a substantial and injurious effect or influence in determining the jury's verdict. Appellant submits that this Court cannot be left with the fair assurance that the error did not influence the jury, or influenced the jury only slightly.

## POINT OF ERROR NUMBER FIVE

**THE TRIAL COURT ERRED WHEN IT LIMITED APPELLANT'S CROSS EXAMINATION OF SERGEANT CLOPTON REGARDING INFLUENCES AND MOTIVES TO FABRICATE A STORY (R-V-12)**

### STATEMENT OF FACTS

In light of the fact that Amber Thornton changed her version of what took place on December 20, 2011 between her first meeting with Sergeant Clopton on December 28, 2011 and the date of her trial testimony, Appellant's cross examination of Clopton focused on the credibility of Amber Thornton. Clopton, a twenty-three year police veteran with nine years

35

experience as a homicide investigator, was asked if he would agree that taking capital murder off the table and offering aggravated robbery and possible probation could influence or be a motive to fabricate a story. (R-V-12)

The State objected on the basis of speculation and relevance.

\ Despite Appellant's assertion that Clopton was qualified to testify as an experienced homicide investigator, the trial court sustained the objection. (R-V-12)

## ARGUMENT AND AUTHORITIES

**Rule 701 of the Texas Rules of Evidence** provides that **a non-expert witness** can offer an opinion or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**Rule 702 of the Texas Rules of Evidence** permits testimony in the form of opinions or otherwise from individuals who possess specialized knowledge which will assist the trier of fact to understand the evidence or to determine a fact in issue.

In the instant case, the credibility of Amber Thornton was at the forefront of Appellant's cross examination. It was thus critically important to educate the jury about any circumstance which could provide a reason for Thornton to fabricate testimony at trial.

The admissibility of evidence generally and the qualifications of a witness to testify as an expert is within the sound discretion of the trial court. **Weatherred v. State, 15 SW3d 540 (Tex. Crim. App, 2000)** Under **Rule 701** a non-expert witness can offer testimony in aid of the jury's fact-finding role. In the instant case, Sergeant Clopton had personal knowledge of Thornton's previous statement given to him on December 28, 2011. This fact, along with his years of experience as a homicide investigator uniquely qualified him to share

36

his insight and knowledge surrounding reasons for a witness fabricating a story or testimony. Clopton was qualified to offer his opinion based on hypothetical questions posed to him. **Jordan v. State, 928 SW2d 550 (Tex. Crim. App. 1996)** Appellant submits that the trial court abused its discretion when it excluded reliable, relevant evidence from Clopton that would have assisted the trier of fact by increasing the juror's awareness of biasing factors in Thornton's testimony. **Tillman v. State, 354 SW3d 425 (Tex. Crim. App. 2011)**

Appellant's right to cross examine witnesses against him, as guaranteed to him by the **Confrontation Clause of the Sixth Amendment,** was violated when he was prevented from questioning Clopton. Appellant submits that the trial court abused its discretion in limiting his cross examination and that a reasonable jury might have had a significantly different impression of the credibility of Thornton if Appellant had been allowed to pursue the questioning. **U.S. v. Maceo, 947 F2d 1191 (5th Cir. 1991)**

## POINT OF ERROR NUMBER SIX

**THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW APPELLANT TO ESTABLISH WHAT QUESTIONS SERGEANT CLOPTON ASKED AMBER THORNTON DURING HER INTERVIEW WITH HIM ON DECEMBER 28, 2011 (R-IV-278,279)(R-V-18)**

## POINT OF ERROR NUMBER SEVEN

**THE TRIAL COURT ERRED WHEN IT REFUSED TO ALLOW APPELLANT TO INTRODUCE AMBER THORNTON'S STATEMENT TO SERGEANT CLOPTON IN EVIDENCE PURSUANT TO RULE 801(E)(1)(E) OF THE TEXAS RULES OF EVIDENCE (R-IV-278,279)(R-V-12-17)**

## POINT OF ERROR NUMBER EIGHT

**THE TRIAL COURT ERRED WHEN IT REFUSED TO ADMIT AMBER THORNTON'S STATEMENT TO SERGEANT CLOPTON UNDER THE RULE OF OPTIONAL COMPLETENESS. (R-V-135-144)**

These Points of error are grouped together pursuant to Rule 38.1(f) of the Texas Rules of Evidence to avoid duplication of statement and argument. These Points of Error concern the same subject matter.

## STATEMENT OF FACTS

When Sergeant Craig Clopton was testifying, Appellant sought to introduce the questions Clopton asked of Amber Thornton when she met with Clopton on December 28, 2011. (R-IV-278,279) The State objected that it constituted impeachment. (R-IV-278) Appellant pointed out that he was just asking what questions Clopton asked, not the responses. (R-IV-278) When Clopton continued his testimony, he confirmed that he considered Amber Thornton a co-conspirator in the commission of the crime that resulted in the death of Russell Lopez. (R-V-12) Appellant sought to introduce Thornton's audio statement made to Clopton (Def. # 1) (Transcript as Def. # 2) submitting that her recorded statement was admissible under **Rule 801 (e)(1)(E) of the Rules of Evidence** as a statement of a co-conspirator. (R-V-13,15,16,17,18,135,136) Appellant also sought admission under **Rule 801 (e)(1)(b)** to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. (R-V-13,138,139) Appellant made a bill of exception documenting the requested statement. (R-V-17,18) (CR-I-Def. Ex. # 2 - transcript) (CR-I- Def. Ex. #1 - audio recording) Appellant also argued that Thornton's statement was admissible under **Rule 107 - the Rule of Optional Completeness.** (R-V-138) Throughout the entire colloquy, the State argued against admission citing hearsay and that it was improper impeachment. (R-IV-278)(R-V-14,17,18) The trial court sustained the State's objections. (R-V-17,136,137,138)

38

## ARGUMENT AND AUTHORITIES

**Rule 801(e)(1)(E) of the Texas Rules of Evidence** allows the introduction of a co-conspirator's statement if made during the course and furtherance of the conspiracy.

**Rule 801(B) of the Texas Rules of Evidence** authorizes the admission of a statement which is consistent with testimony offered to rebut an express or implied charge of recent fabrication or improper influence or motive.

**Rule 107 of the Texas Rules of Evidence** provides that once a statement is given in evidence by one party, the whole on the subject may be inquired into by the other party to make it more fully understood or to explain the same.

A co-conspirator's statement is admissible pursuant to **Rule 801(e)(1)(E)** when two or more people take part in the commission of a felony, even though the substantive crime of conspiracy is not charged. **Meador v. State, 812 SW2d 330 (Tex. Crim. App. 1991)** This rule is applicable to any offense. **Meador** In the instant appeal, Appellant offered Thornton's statement as substantive evidence because in her statement to Sergeant Clopton she was in furtherance of the conspiracy by trying to keep its existence from being discovered by law enforcement. King **v. State, 189 SW3d 347 (Tex. App. - Fort Worth 2006, no pet.)** Appellant submits that the jury should have been afforded the opportunity to understand how Thornton went from claiming ignorance (with Clopton) to becoming the star witness for the State at trial.

When Thornton testified and gave testimony that was at odds with her statement made to Clopton, the jury was entitled to the benefit of the whole of her statement under the **Rule of Optional Completeness.** The rule permits the introduction of evidence when it is necessary to fully and fairly explain a matter opened up by the adverse party. **Walters v. State, 247 SW3d 204 (Tex. Crim. App. 2007)** The jury was deprived of the full flavor of

39

the exchange taking place between Sergeant Clopton and Thornton on December 28, 2011.

The Court's rulings prevented Appellant from presenting a full and complete defense.

**Homes v. South Carolina, 547 U.S. 319 (2006).**

## POINT OF ERROR NUMBER NINE

**THE TRIAL COURT ERRED WHEN IT PREVENTED APPELLANT FROM CROSS EXAMINING AMBER THORNTON ABOUT HER HABIT AND ROUTINE OF LYING TO LAW ENFORCEMENT TO AVOID RESPONSIBILITY FOR HER ACTIONS. (R-V-159.160,193,194)**

### STATEMENT OF FACTS

During cross examination of Amber Thornton, Appellant sought to elicit testimony that she had previously lied to law enforcement concerning a separate investigation. (R-V-159) The State objected that it was improper impeachment by a specific act. (R-V-160) Appellant's counsel offered a proffer and bill of exception setting forth a prior incident where police investigated Joseph Facundo for theft and found stolen property. (R-V-192,193) Appellant noted that Thornton was questioned by police and lied to them about her knowledge of the crime. (R-V-159,160) Appellant's argument was that Thornton told a story to get out of trouble, just like she did in the instant case. (R-V-160,192,193) The trial court sustained the State's objections and did not allow Thornton to be questioned in the presence of the jury. (R-V-160,192,194)

### ARGUMENT AND AUTHORITIES

**Rule 406 of the Texas Rules of Evidence** provides that evidence of habit of a person, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person on a particular occasion was in conformity with the habit.

Amber Thornton's credibility was in question throughout this trial. Appellant's

40

position was that Thornton would lie when it was in her best interest to do so. Appellant sought to introduce evidence of Thornton's habit of lying by delving into her previous interaction with law enforcement investigating none other than Joseph Facundo.

**See: Guerrero v. State, 2011 WL 680314 (Tex. App. - Houston [14ᵗʰ Dist.] 2011)** where habit evidence was found to be admissible even against a charge that its admission violated **Rule 404(b).** Appellant submits that it was error to deny him cross examination concerning Thornton's habit of lying to get out of trouble. This was evidence the jury needed to hear as part of its credibility evaluation of Thornton.

## POINT OF ERROR NUMBER TEN

**THE TRIAL COURT ERRED WHEN IT REFUSED APPELLANT'S REQUESTED JURY INSTRUCTION ON NECESSITY (R-VII-4) (SX # 59 & 60)**

## STATEMENT OF FACTS

Appellant's statements given to Sergeant Craig Clopton on December 31, 2011 and January 3, 2012, were introduced in evidence as State's Exhibits 59 & 60. In State's Exhibit # 59, a tearful Appellant told Clopton that everything was "unexpected". He explained that he did not know where Joseph Facundo obtained the hammer Facundo used to strike Russell Lopez. Appellant said he was just shocked seeing the guy. He described being "frozen". Appellant was scared and he didn't know what to do. Appellant noted that if Facundo could do that to Lopez, why couldn't he just do it to him too. Appellant told Clopton he wanted to run because he was afraid for his life. In State's Exhibit # 60, Appellant explained that he didn't know where Joseph Facundo got the hammer. Appellant said that he just froze after Facundo hit Lopez with the hammer. Appellant told Clopton how he was scared so he tied up the kids as ordered by Facundo. Sergeant Clopton is heard on State's Exhibit # 60 talking about the necessity defense when he says that he can understand if Appellant was doing

41

things at his [Facundo's] command. Clopton told Appellant that he understood that he [Appellant] didn't want him [Facundo] to kill him.

After both sides rested and closed, the trial court asked the parties whether there were any objections to the court's proposed jury charge. (R-VII-4)

Appellant objected to the absence of a jury instruction concerning the defense of "necessity". Appellant specifically requested that a defense of necessity instruction be given to the jury. (R-VII-4) The trial court denied Appellant's request. (R-VII-4) The instructions provided to the jury did not mention the defense of necessity. (CR-I-236-257) The jury found Appellant guilty of capital murder, as charged in the indictment. (CR-I-258)

## ARGUMENT AND AUTHORITIES

**Article 36.15 of the Texas Code of Criminal Procedure** authorizes the submission of special charges to the jury based on the evidence raised at trial. Long-standing precedent provides that a trial judge must, upon a defendant's proper request, instruct the jury on every defensive issue raised by the evidence without regard to its source or strength. Under this doctrine, it is of no consequence whether such evidence or testimony was produced by the prosecution or the accused, or whether such evidence or testimony might be strong, weak, unimpeached, or contradicted. **Booth v. State, 679 SW2d 498 (Tex. Crim. App. 1984)** As the court noted in **Booth,** it is the trier of the facts, an no one else, who has the responsibility to decide whether to accept or reject the defensive theory.

**Section 9.22 of the Texas Penal Code** provides that conduct is justified if:

(1) the actor reasonable believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to

42

ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

In reviewing the trial court's refusal to give a necessity instruction, this Court will look to the facts set out in Appellant's statements to Sergeant Clopton (SX # 59 & 60). Appellant submits that in the absence of any direct evidence establishing he actually committed the specific acts set forth in the indictment, the only arguable claim for conviction would be based on the law of parties. In admitting that he tied up the kids because he was scared of Joseph Facundo and that he feared the same fate could await him if he didn't do as ordered, Appellant provided evidence sufficient to warrant the submission of a necessity instruction. The Court of Criminal Appeals has decided several cases involving the necessity defense and the application of the confession and avoidance doctrine. **Juarez v. State, 308 SW3d 398 (Tex. Crim. App. 2010) Cornet v. State, 359 SW3d 217 (Tex. Crim. App. 2012)** In **Juarez**, the Court held that even though the appellant maintained he never intentionally, knowingly or recklessly engaged in an assault against a peace officer, the jury could reasonably infer that specific conduct from the self-described actions taken by the appellant. On that basis, the Court found that the appellant had satisfied the requirements and was therefore entitled to a jury instruction on necessity.

The facts and circumstances confronting Appellant on December 20, 2011, resulted in actions he reasonably believed were immediately necessary to avoid imminent harm. Appellant submits he was entitled to a charge on necessity as set forth in **Section 9.22 of the Texas Penal Code.**

43

## POINT OF ERROR NUMBER ELEVEN

**THE TRIAL COURT ERRED WHEN IT REFUSED APPELLANT'S REQUEST FOR A JURY INSTRUCTION ON THE LESSER OFFENSE OF THEFT (R-VII-5,6)**

### STATEMENT OF FACTS

Appellant requested a jury instruction on the lesser-included offense of theft . (R-VII-5) The trial court denied the requested instruction. (R-VII-5)

During his custodial statement on December 31, 2011, Appellant informed Sergeant Clopton that he had only received maybe less than $1,000.00 from the proceeds of what was taken from Russell Lopez. (State's Exhibit # 59) (R-V-201) On January 3, 2012 , while still in custody, Appellant confirmed to Clopton that he never got anything other than $1,000.00. (State's Exhibit # 60) (R-V-208)

### ARGUMENT AND AUTHORITIES

**Section 31.03 of the Texas Penal Code** states that a person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property. Theft of property valued at $500.00 to $1,500.00 is classified as a Class "A" misdemeanor.

To determine whether an instruction for a lesser included offense is required, appellate courts apply a two part test. **Rousseau v. State, 855 SW2d 666 (Tex. Crim. App. 1993)** First, the lesser included offense must be included within the offense charged. Second, there must be some evidence in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty of only the lesser offense. Appellate courts should review all the evidence presented at trial in making this determination. **Bignall v. State, 887 SW2d 21 (Tex. Crim. App. 1994)**

Theft may be a lesser included offense of capital murder. **Holiday v. State, 14 SW3d 784 (Tex. App. - Houston [1ˢᵗ Dist] 2000, pet ref'd)** The first prong of the **Rousseau** test

44

was satisfied in the instant appeal. For reasons stated below, there was evidence in the record that would have permitted the jury rationally to find that Appellant was guilty only of theft.

As noted in the preceding Point of Error concerning the necessity defense instruction, the State offered evidence through Sergeant Craig Clopton establishing that Appellant only received $1,000.00 or less in this case. Additionally, there was evidence presented that Appellant did not hit or stab the complainant. (SX # 59 & 60) (R-V-201,208)

Although Amber Thornton testified at trial that there was a plan to rob Russell Lopez, cross examination of Ms. Thornton also produced evidence that there was no such plan and that she had only casually encountered Appellant on the street as he was going to the complainant's home. (R-V-68)(R-V-145) Thornton stated that Joseph Facundo was responsible for hitting the complainant on the head and using a sword on him. (R-V-88, 105)

As this Court observed in **Holiday**, to be entitled to a jury instruction on the lesser included offense of theft, there must be evidence proving Appellant committed a theft of property, but did not injure or threaten the complainant in any way.

Appellant submits that in light of the conflicting evidence presented at trial, he was still entitled to the submission of a jury instruction on the lesser included offense of theft.

### POINT OF ERROR NUMBER TWELVE

**THE TRIAL COURT ERRED WHEN IT COMMENTED ON THE WEIGHT OF THE EVIDENCE IN THE INSTRUCTIONS GIVEN TO THE JURY CONCERNING THE LAW OF CONSPIRACY (R-VI-4,5) (CR-I-240)**

### STATEMENT OF FACTS

The proposed jury instruction stated, in part: "By the term "conspiracy" as used in these instructions, is meant an agreement between two or more persons with intent, that they, or more than one of them, engage in conduct that would constitute the offense. An agreement

45

constituting a conspiracy, if any, may be inferred from acts of the parties." (CR-I-240)

Appellant objected that the instruction, as worded, constituted a comment on the weight of the evidence. (R-VI-4,5) The trial court overruled the objection. (R-VI-5)

## ARGUMENT AND AUTHORITIES

**Article 38.05 of the Texas Code of Criminal Procedure** prohibits the trial judge, at any stage of the proceeding previous to the return of the verdict, from making any remark calculated to convey to the jury his opinion of the case.

**Texas Penal Code Section 15.02** includes as part of the conspiracy definition, that (2) he or one or more of them performs an overt act in pursuance of the agreement.

An impermissible comment in the judge's instructions to the jury is an especially powerful message (whether intentional or not) to the jury about the court's view of the evidence. In the instant appeal, the jury was free to find that because the parties may have engaged in some conduct, that conduct alone was sufficient to establish the existence of a criminal conspiracy. The jury was not charged in accordance with **15.02 (a)(2)**. Without a more narrowly defined instruction, Appellant submits the trial court erred by commenting on the weight of the evidence. As the court observed in **Bachus v. State, 803 SW2d 402 (Tex. App. - Dallas, 1991)** jurors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved. **Jones v. State, 788 Sw2d 834 (Tex. App. - Dallas 1990, no pet.)**

## PRAYER FOR RELIEF

Appellant prays that after the Court consider the Points of Error raised herein, it will reverse Appellant's conviction and order a judgment of acquittal. In the alternative, without

waiving the foregoing prayer, Appellant prays for a new trial. Further in the alternative, Appellant requests that this Court reform the verdict / judgment to reflect the offense of aggravated robbery or theft and order a new punishment hearing.

Respectfully submitted,

Wayne T. Hill
SBOT: 09656300
4615 Southwest Freeway, Suite 600
Houston, Texas 77027
Tel: (713) 623-8312
Fax: (713) 626-0182
wthlaw@aol.com

Attorney for Tony Escobar

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Brief complies with Rule 9.4 of the Texas Rules of Appellate Procedure. According to the computer program used to prepare this document, the word count is 14,746.

Wayne T. Hill

## CERTIFICATE OF SERVICE

A true and correct copy of this Brief will be served on the Harris County District Attorney's Office - Appellate Division.

Wayne T. Hill